**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.                                              No. 01-5013

SALEEM PORTER,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CR-01-272)

Argued: September 26, 2002

Decided: October 29, 2002

Before MOTZ, TRAXLER, and GREGORY, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Vincent L. Gambale, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Murray Joseph Janus, BREMNER, JANUS, COOK & MARCUS, Richmond, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alessandra DeBlasio, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Taylor B. Stone, BREMNER, JANUS, COOK & MARCUS, Richmond, Virginia;

David S. Rudolf, RUDOLF, MAHER, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The Government appeals the district court's order granting Saleem Porter's motion to suppress crack and powder cocaine found in his car. We reverse and remand for further proceedings.

I.

On August 22, 2001, three members of Virginia's police drug interdiction unit, Troopers Lee Elliott, David Batkins, and Debbie King, were patrolling Interstate 95 in Hanover County, Virginia in unmarked cars. At approximately 1:45 p.m., Trooper Batkins noticed two white sport utility vehicles, apparently traveling together, one with Georgia plates, trying to speed through traffic. He radioed ahead to advise Trooper Elliott of the vehicles, but Trooper Batkins did not indicate any suspicions that the cars were carrying drugs, nor did he attempt to stop the vehicles.

Soon after receiving this call, Trooper Elliott observed a white van with Georgia license plates passing him on the left. However, Trooper Elliott admitted that he never saw another car traveling with this van, or a car that matched the description radioed by Trooper Batkins. Nevertheless, Trooper Elliott followed the white van, which, although moving in the normal flow of traffic, was traveling at between 70 and 79 miles per hour in a 65-mile-per-hour speed zone, and switching lanes without properly using a turn signal.

Having observed these traffic infractions, Trooper Elliott turned on his vehicle's lights and an internal video camera, and pulled the van

to the side of the road. A videotape recorded the entire encounter and the events set forth below.

Trooper Elliott approached the van and asked the driver, Saleem Porter, for his license, and told Porter why he had been pulled over. Porter explained that he had not driven in a while because of an arm injury he suffered through his construction job. Trooper Elliott asked Porter to accompany him to the trooper's car so that the he could run a check on Porter's license. Porter agreed, getting out of his vehicle without apparent difficulty, mentioning that his arm felt "better right now."

Noting Porter's baggy shirt, Trooper Elliott asked Porter if he could feel Porter's pockets. Porter agreed and Trooper Elliott told him "[t]his is all just voluntary stuff here." Having checked his pockets, Trooper Elliott did not otherwise pat Porter down. Porter then got into Trooper Elliott's vehicle with Elliott.

Trooper Elliott testified that during the next seven minutes he completed paperwork while questioning Porter about various matters, including Porter's job and his injury, his speeding, his current trip, his address, and the vehicle's registration. The trooper then radioed in to run a check on Porter's license. Within another minute and a half, the license check came back clear and Trooper Elliott gave Porter his papers, a warning, but no ticket, and told him to be more careful.

After wishing Porter a "good trip," Trooper Elliott asked Porter if he wanted to be let out of the police car. Porter said that he did. Trooper Elliott reached across and opened the door for Porter, and as Porter was getting out of the trooper's car asked "before you go . . . you don't have any firearms or weapons . . . or money or drugs or anything like that in the car?" Porter replied that he did not: "I make over a half a million dollars a year, and I wouldn't want to jeopardize my life and career." Elliott then explained that he was part of a "special group of troopers" whose job involved drug and weapon interdiction. He told Porter that he often pulled people over with the intention of obtaining permission to search their cars.

At this point, Porter volunteered: "Officer, you can look through the car. I have no problems with looking through the car." Porter also

mentioned that he was "familiar with the process" because his father was an attorney in Atlanta, and stated again that "you can look through the car." Trooper Elliott told Porter that it would just be a minor inconvenience, that the matter was "strictly voluntary," and that Porter should sit in the police vehicle while he took a "quick look."

After radioing the other officers, Trooper Elliott informed Porter that backup officers might arrive. He did not tell Porter that the other officers would be participating in the search, nor did he request Porter's approval for their participation. However, Trooper Elliott did tell Porter several ways to get the troopers' attention if he wanted to during the search, and Porter, in turn, told the trooper not to put up the van's windows with the key in the ignition because the car would lock.

Trooper Elliott began to search Porter's van at 2:04 p.m.. Troopers Batkins and King arrived with the drug dog soon thereafter. During the next three minutes, the troopers unzipped bags, opened the rear hatch, looked underneath carpeting, and underneath the van itself.

Trooper Elliott later testified that several factors uncovered during this search aroused his suspicions: the van's odometer was set to the trip function and showed more than 2,800 miles; the total odometer read over 215,000 miles; fast food wrappers littered the van; and the van's interior was in disarray. At approximately 2:08 p.m., Trooper Batkins opened the van's rear hatch, and about 15 seconds later, Trooper Elliott noticed a gap of between 8 and 12 inches in the bottom of the van. He suggested looking under the van but Trooper King said that she should run the drug dog first.

At approximately 2:12 p.m. (eight minutes after the troopers began their search of the van), the dog alerted to the rear of the car. Immediately after the dog alerted, Trooper Elliott went back to his car to speak to Porter, who said, "Officer, I would just like to say this: . . . I just really don't like this, man. I mean, I know I have been cooperative . . . but . . . was this really necessary Officer?" Trooper Elliott told Porter he had been "great" and that the officers were just exploring what they had found. Porter said "[a]ll right," but the troopers noted that he had become very nervous.

The troopers continued searching the car, and at approximately 2:20 p.m., found a secret compartment. Trooper Elliott then handcuffed Porter, telling him he was not under arrest, but they were detaining him because of suspicions about his vehicle. The officers spent about an hour trying to gain access to the secret compartment. At one point, after reading him his *Miranda* rights, Trooper Elliott asked Porter whether he would cooperate, but Porter elected not to discuss the situation. The troopers eventually found approximately three quarters of a kilogram of crack cocaine and one kilogram of powder cocaine inside the secret compartment in the car; they then arrested Porter.

## II.

After considering the evidence, including Trooper Elliott's testimony and the videotape, the district court granted Porter's motion to suppress the crack and powder cocaine found in his van. The court found that because Trooper Elliott observed a legitimate traffic violation, the resulting traffic stop of Porter was justified. The court held, however, that the totality of circumstances in the instant case demonstrated that Porter had not consented to the search, and that even if he had consented, the search exceeded the scope of that consent.

The Government maintains that the district court erred both in its assessment of the voluntariness of the search and the scope of Porter's consent. An appellate court reviews a district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992). In this case, notwithstanding Porter's understandable attempt to gain the advantage of a deferential standard of review by casting the district court's conclusions as fact finding, the critical facts, all of which the videotape memorialized, are undisputed. Therefore, the district court's ultimate holdings as to the voluntariness and scope of the consent are, as the district court itself properly recognized, "conclusions of law," subject to our *de novo* review. With this understanding, we consider both of these holdings in turn.

## A.

Although the Fourth Amendment clearly prohibits unreasonable searches and seizures, and searches without a warrant are *per se*

unreasonable unless a valid exception applies, it is equally clear that a search to which a suspect has consented is an exception to this requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). The Government, of course, has the burden of proving that the consent was freely and voluntarily given. *Id.* at 222.

Determination of the voluntariness of consent involves an objective analysis of the totality of circumstances surrounding the consent. *See, e.g.*, *id.* at 227; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). A court must decide, given the totality of the circumstances, whether "a reasonable person in the suspect's position would have felt free to decline the officers' requests or otherwise terminate the encounter." *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). In reviewing the totality of the circumstances, we consider the characteristics of the suspect, such as age, maturity, education, intelligence, and experience; and the conditions under which the consent was given, such as the number of officers present, and the duration, location, and time of the encounter. *Lattimore*, 87 F.3d at 650.

As one of its first conclusions of law, the district court held, that "the continued detention of . . . [Porter after the completion of the license check and issuance of a warning] was illegal" and Trooper Elliott was therefore not entitled to request Porter's consent for a search. This conclusion does not accord with well-settled case law. Rather, the Supreme Court has clearly held that the actual motivations of individual officers in stopping vehicles is irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996)(noting that precedent "forclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."). Furthermore, we have repeatedly held that once a traffic stop has concluded, a continued conversation between an officer and suspect can be a consensual encounter if a reasonable person would have felt free to leave. *See, e.g.*, *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002) ("Circumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual, and therefore do not implicate the Fourth Amendment.").

Indeed, we have held consent voluntary on facts very similar to those in the case at hand. In *Lattimore*, as here, a trooper stopped a

suspect and escorted him to his car because of a traffic violation. 87 F.3d at 649. Moreover, as here, after checking the suspect's license and returning it to him, while the suspect was exiting the car, the officer asked if he could search the vehicle. *Id.* Finally, again as here, the suspect orally consented and the resulting search turned up illegal narcotics. *Id.* at 649-50. We found the consent voluntary even though the suspect, Lattimore, later refused to sign a written consent form, because the totality of the circumstances indicated that a reasonable person would have felt free to decline the request for consent. *Id.* at 651. Those circumstances included: the suspect's relative sophistication evidenced by his education, the casualness of conversation engaged in by the officer and the suspect, the time and location of the incident — on a well-traveled highway in the middle of the afternoon, the fact that only one officer was present when the suspect gave his consent, and the fact that the stop was not of inordinate duration. *Id.*

Similarly, in this case, Porter was relatively sophisticated, volunteering that he knew the law because his father was an attorney; Porter and Trooper Elliott engaged in casual conversation during the traffic stop; the incident occurred on a well-traveled highway in the middle of the day; only one officer was present when Porter gave his consent; the stop was not long; and the conversation following the conclusion of the traffic stop lasted only about one minute. *See also Sullivan* 138 F.3d at 133 (holding a search consensual even though an officer repeatedly asked questions about the presence of illegal items in the car, after returning a suspect's license at the conclusion of a traffic stop).

The district court distinguished *Lattimore* from the present case because Trooper Elliott said "before you go" to Porter as Porter was getting out of the car, thus assertedly *requiring* Porter to answer the questions before resuming his trip. This conclusion flies in the face of *Ohio v. Rabinette*, 519 U.S. 33, 36 (1996), in which the Supreme Court held that the consent obtained from an individual after an officer asked "before you get gone: Are you carrying any illegal contraband in your car?" was valid even though the officer did not tell the individual he was free to go. As the Government points out, there is little difference between "before you get gone" and "before you go." Moreover, the Supreme Court has unequivocally stated that no one

fact should be dispositive when determining whether a reasonable person would find conditions coercive. *Id.* at 39.

The district court also suggested that the case at hand differed from *Lattimore* because Trooper Elliott knew Porter needed help getting out of the car, and thus Porter was not free to leave before answering the request to consent to a search. However, Trooper Elliott had already opened the door for Porter and Porter had a foot out of the car before the trooper ever made his "before you go" request. At that time, Porter no longer needed Elliott's help to get out of the car.

In sum, our precedent requires the conclusion that Porter voluntarily gave his consent to the search of his van.

B.

As to the scope of the search, the Supreme Court has again established that the appropriate test is an objective one — what would a reasonable person have understood the exchange between the officer and the individual to encompass. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Individuals may limit the scope of their consent, but when, as here, a suspect does not expressly limit the scope of the search, the test remains what a reasonable person would believe to be included within the scope of the consent. *Id.* at 252.

In *Jimeno*, the Court concluded that once Jimeno gave consent to search his car without limitation, it was reasonable to search in a paper bag on the floor of the car because the officer informed Jimeno that he was looking for drugs, and a reasonable person would expect to find drugs inside a container. *Id.* at 251. Similarly, Trooper Elliott told Porter that he was a member of a narcotics interdiction unit, so it was reasonable for Porter to assume that the trooper would be looking for drugs in hidden areas in his van, not just those in plain view, as Porter argues. The district court recognized that had the conversation between Trooper Elliott and Porter ended with the trooper telling Porter he was looking for drugs, Porter would have no colorable contention that the search exceeded the scope of his consent. However, because Trooper Elliott told Porter that he just wanted to take a "quick look through" the van, never used the word "search," and told Porter that he would be out of there quickly, the court held that Porter

limited the search to a limited look through of his van, and never gave any consent to open any closed or locked part of the van.

There are several problems with this conclusion. First, the tape reveals that Porter specifically told Trooper Elliott not to put the windows up when he was inside Porter's van because the van would lock, indicating that Porter himself recognized that the troopers would need to open various parts of the van in the course of their search. *Jimeno*, 500 U.S. at 251.

Moreover, Porter volunteered his consent several times even after Trooper Elliott had specifically told Porter that he was part of a "special group of troopers" whose "job is to stop the flow of drugs and weapons . . . through the Commonwealth of Virginia." Although Porter could have withdrawn his consent at anytime, he failed to do so. In fact, Porter reaffirmed his consent even after the officers had removed the carpeting in the van, and the drug dog alerted to his rear hatch; at that time, when Trooper Elliott told Porter the officers were just going to see what they had found, Porter replied "[a]ll right." For all of these reasons, we can only conclude that a reasonable person would have believed that the troopers' search of Porter's van was well within the scope of his consent.

## III.

For the foregoing reasons, the district court's order granting Porter's suppression motion is reversed and the case is remanded for further proceedings.

*REVERSED AND REMANDED*