# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3280

_____

United States of America,           *
                                    *
         Appellant,         *
                                    *   Appeal from the United States
     v.                   *   District Court for the
                                    *   District of North Dakota.
Manuel Quintero, and        *
Michelle Marie Quintero,     *
                                    *
         Appellees.        *

_____

Submitted: May 13, 2011
Filed: August 8, 2011

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

Manuel and Michelle Quintero were charged with conspiracy to possess with intent to distribute and distribute in excess of 50 grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2; possession with intent to distribute in excess of 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956. The Quinteros moved to suppress evidence seized from a warrantless search of their hotel room, contending Michelle did not voluntarily

consent to the search. The district court[1] agreed, granting the motions to suppress from which the government now appeals. We affirm.

I

On September 15, 2009, security personnel at the Dakota Magic Casino and Hotel in Hankinson, North Dakota, reported to Agent Jason Weber of the Richland County Sheriff's Office a glass lightbulb in one of the hotel rooms had apparently been used as a smoking device for narcotics. Although the occupant of the room where the bulb was found, Manuel Quintero, had recently checked out, hotel staff discovered reservations for the upcoming night under the name of Michelle Quintero, Manuel's wife. Weber, who was familiar with the Quinteros, requested the hotel security personnel notify him when the couple returned. Around 4:30 p.m., hotel security informed Weber of the Quinteros's return, and Weber thereafter asked the security team to conduct surveillance of the couple until law enforcement arrived.

Over five hours later, around 9:45 p.m., Weber and two other task force officers reached the hotel. The officers began their investigation by utilizing a K-9 sniff on two vehicles believed to be associated with the Quinteros, as well as a sniff outside the hotel rooms the Quinteros and their friends had rented for the night. The dog failed to alert at the respective locations, however, leading the officers to conduct a "knock-and-talk" with the Quinteros around 10:35 p.m. due to the absence of any probable cause. At this time, Weber – surrounded by another agent, hotel security personnel, and an associate manager – knocked on the Quinteros's hotel room door three separate times.[2] After the third round of knocking, a man inside the room, later

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota.

[2]The officer with the K-9 unit was returning the dog to his vehicle at the time the knock-and-talk commenced, but later rejoined the other two officers in the search.

identified as Manuel, asked, "Who is it?" Rather than identifying himself with the Sheriff's Department, Weber answered, "Security." Upon opening the door, Manuel asked if he should step outside the room. He also informed the officers his "girlfriend," later identified as Michelle, was undressed in the darkened room. While Manuel stood in the hallway, Weber directed Michelle to get dressed on multiple occasions and come to the door.

After four or five minutes, Michelle approached the door and proclaimed to the officers, "You're scaring the shit out of me, what happened?" Weber asked Michelle if she rented the room and if the officers could come inside. Although the government asserts Michelle answered in the affirmative, the district court noted a tape recording of the incident was inaudible as to her response. After her remarks, Weber asserted, "We'll come in with you so we're not making a spectacle in the hallway." Once inside, the officers turned the light on and asked Michelle if there was anything in the room she wanted to inform the officers of, to which she replied "no" and "not that I know of." Weber then probed multiple times whether the officers could "tak[e] a look around." He explained to Michelle the request stemmed from the discovery of the lightbulb in the room rented by Manuel the previous night. On the recording, Michelle was heard asking if she had a "right to ah," as well as stating, "I don't know" and "I don't understand." She also reiterated multiple times the officers were scaring her, prompting Weber to attempt to reassure Michelle by clarifying the officers just wanted to take "a quick peek around."

After Michelle finally consented to a search of the room, the officers began conducting a thorough inspection, including an examination of the Quinteros's personal belongings, despite Weber's prior representations indicating the officers only wanted to take "a quick peek around." Weber further embellished the evidence the officers maintained against the Quinteros, as he told Manuel the lightbulb discovered the previous night had been dusted for fingerprints, which matched Manuel's fingerprints, and he asked Manuel about the incident. During the

-3-

suppression hearing, Weber admitted he never actually dusted the lightbulb and he intentionally misrepresented the evidence to Manuel.

Amid the officers' search of the room, Michelle objected, "Can you stop and get out of here?" Weber stated the officers could stop searching, but they would not leave. Seconds later, another officer declared he found apparent methamphetamine residue on a plastic wrapper in Michelle's purse, which was located inside a night stand drawer. The officers then ceased the search immediately and informed the Quinteros they would be detained pending a search warrant. After the officers subsequently discovered a syringe needle and ziploc baggies on Michelle's person, both Michelle and Manuel were arrested. Upon obtaining a search warrant the following day, officers uncovered more than 200 grams of methamphetamine.

The Quinteros were charged with conspiracy to possess with the intent to distribute and distribute methamphetamine, possession with intent to distribute, and conspiracy to engage in money laundering. Manuel, later joined by Michelle, moved to suppress evidence based on the unlawful search of the hotel room. Following an evidentiary hearing, the district court issued an order bifurcating its analysis into two stages, considering whether Michelle voluntarily consented to the officers' (1) entry into the room and (2) search of the room. Taking up the first issue, the court noted whether Michelle consented was "a close call," given Weber's conduct outside the room, but the court ultimately held a reasonable person could find Michelle impliedly consented to the officers' entry into the room. Once the officers gained entry to the room, the court held the totality of the circumstances did not demonstrate Michelle voluntarily consented to their search. Specifically, the court discussed the officers' unexplained five-and-a-half-hour delay in arriving at the hotel, which resulted in them rousing the Quinteros from sleep after 10:30 p.m. The court was also concerned with the officers' pressure on Michelle, the number of officers involved, the coercive environment surrounding the search, and Michelle's repeated expressions of fear. Under these circumstances, the court granted the Quinteros's motions to suppress all

-4-

evidence seized as a result of the search of the hotel room. The government filed this interlocutory appeal under 18 U.S.C. § 3731, challenging the court's voluntariness determination based on the court's (1) consideration of irrelevant factors; (2) failure to consider proper factors; and (3) misapplication of factors.[3]

II

## A. Standard of Review

Before reaching the merits of the government's appeal, we first address the applicable standard of review. When reviewing a district court's suppression determination, we review the court's factual findings for clear error and its legal conclusions de novo. United States v. Johnson, 619 F.3d 910, 917 (8th Cir. 2010). "The voluntariness of a consent to search is a factual question that is reviewed for clear error." Id. at 918.

Although the government recognizes the voluntariness inquiry is a factual question reviewed for clear error, it seeks a de novo review in light of the recording

---

[3]The government contends the Quinteros chose not to cross-appeal the court's ruling as to Michelle's consent to enter the hotel room and thus conceded her consent was voluntary. Appellant's Reply Br. at 14. The government goes on to argue this supposed concession undermines the Quinteros's arguments with respect to their consent to search the room. We note the government's arguments in this regard are plainly contrary to the ambit of § 3731, which provides only *the government* with the right to an interlocutory appeal of a suppression order. See United States v. Marasco, 487 F.3d 543, 546 (8th Cir. 2007) ("While § 3731 gives the government the ability to appeal from an order granting a pretrial motion to suppress, this statute does not provide for a cross-appeal by the defendant."). Correspondingly, we reject the government's endeavors to cast negative light upon the Quinteros's inability to cross-appeal the suppression order as it pertains to Michelle's consent to enter the hotel room, and we express no opinion on the validity of her consent to enter the room.

of the September 15, 2009, search of the Quinteros's hotel room, which was admitted into evidence at the suppression hearing. According to the government, because the entire encounter was recorded, and Michelle did not testify at the hearing, the recording is the undisputed factual record in this case. Thus, the government argues it is only challenging the court's legal conclusions based upon the undisputed facts.

We decline to apply a de novo standard of review. First, we are guided by our well-established precedent demonstrating the voluntariness determination is a factual question reviewed for clear error. See United States v. Garcia, 613 F.3d 749, 753 (8th Cir. 2010) ("Whether consent is voluntary is a question of fact, reviewed for clear error"); United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007) ("The voluntariness of a consent to a search is a factual question that is reviewed for clear error."). Were we to accept the government's argument, we would run afoul of these cases – none of which apply a de novo standard of review in the voluntariness context, as the government acknowledges.

Second, we are unpersuaded by the government's efforts to distinguish this case based on the tape recording. As an initial matter, the recording fails to provide a complete accounting of the facts of the encounter, which may help explain why the government felt it necessary to call two officers at the suppression hearing to testify as to their version of the events, rather than relying solely on the recording as the complete factual record. For instance, there is a void in the recording concerning the number of officers present during the search, the officers' blocking of the hotel room door, and the officers' physical appearance, i.e., Weber's frame of standing 6'4'' and 260 pounds and whether the officers were uniformed or in plain clothes. In addition, the recording is inaudible during crucial times, such as when Michelle responded to Weber's initial request for consent. On the other hand, certain statements evident on the recording turned out to be falsehoods, which was demonstrated only by Weber's later admissions to the contrary, including his misstatement of his identity while he knocked on the door, his intended scope of the search, and his false confirmation of

-6-

Manuel's fingerprints on the lightbulb through forensic evidence. Moreover, Weber testified to additional facts not present on the recording, such as Michelle's nervous demeanor. Under these circumstances, we cannot accept the government's argument as to the recording being the complete factual record of the incident.

Furthermore, most of the cases cited by the government in support of its suggested de novo review restate, unremarkably, the general standard concerning our review of a district court's factual findings for clear error and its legal conclusions de novo, as we recognized above. See Johnson, 619 F.3d at 917 ("We review a district court's factual findings for clear error and legal conclusions *de novo* when reviewing the denial of a motion to suppress."); United States v. Scott, 610 F.3d 1009, 1015 (8th Cir. 2010) ("Scott does not dispute that the police were lawfully present in the common hallway, nor does he dispute the other facts surrounding Nation's sniff and alert. Thus, we review de novo the ultimate question of whether the Fourth Amendment has been violated.") (internal quotation marks and citation omitted); United States v. Valle Cruz, 452 F.3d 698, 702 (8th Cir. 2006) ("We review for clear error the District Court's findings of historical fact, about which there is virtually no dispute in this case because most of those facts are evidenced on at least the audio portion of the videotape.") (internal citation omitted); United States v. Leppert, 408 F.3d 1039, 1041 (8th Cir. 2005) ("The facts are not in dispute, and we review *de novo* the district court's legal conclusions"); United States v. Williams, 359 F.3d 1019, 1020 (8th Cir. 2004) ("The facts stated above are not in dispute. Rather, the conclusion that the Fourth Amendment was not violated is the focus of our analysis."); United States v. Porter, 49 F. App'x 438, 441 (4th Cir. 2002) (unpublished per curiam) (reviewing the district court's voluntariness determination de novo based on the undisputed facts, which were memorialized on a videotape).

More importantly, to the extent these cases are applicable to the question of voluntariness, we find them distinguishable because each involved undisputed facts. In this case, notwithstanding the government's concession to certain disputed facts

noted by the Quinteros, such as the number of officers present at the hotel, the government continues to challenge matters more properly characterized as factual determinations. For instance, the government argues there was no improper delay on the part of the officers in arriving at the hotel; Michelle was "scrubbing" the hotel room clean of drugs during the time the officers were awaiting her arrival at the door, rather than dressing herself; she maintained control over the entire encounter with law enforcement; her fear was likely due to the hidden methamphetamine, rather than the officers' conduct; and the officers exerted no improper pressure on her to consent. The Quinteros dispute each of these facts, among others argued by the government – many of which played a critical role in the court's analysis.

Finally, the clear error standard we employ here reinforces the district court's province to make factual findings regarding the nuances, tone of voice, and other subtle aspects inherent in determining whether an individual voluntarily consented to a search. Cf. United States v. White, 81 F.3d 775, 779 (8th Cir. 1996) (analyzing the cooperative tone of conversation between the officer and the defendant – one of "[t]he facts found by the district court" – in concluding the defendant was not seized under the Fourth Amendment); see also United States v. Meza-Gonzalez, 394 F.3d 587, 592 (8th Cir. 2005) ("Determination of consent necessarily involves judging the credibility of witnesses, a task generally left to the district court."). After considering all the evidence, including these subtle aspects reserved for the fact-finder, the district court was required to weigh the evidence to determine whether Michelle voluntarily consented. For the reasons above, this is a factual question we review for clear error.

## B. The District Court's Voluntariness Determination

While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain a resident's voluntary consent. United States v. Kelley, 594 F.3d 1010, 1013 (8th Cir. 2010). The government bears the burden of proving voluntary consent. United States v. Willie, 462 F.3d 892, 896

(8th Cir. 2006). In determining whether consent is voluntary, courts examine the totality of the circumstances, including relevant factors such as

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [her] <u>Miranda</u> rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010) (citation omitted). The government contends the district court erred in its analysis of these factors by relying on irrelevant factors, failing to consider proper factors, and improperly weighing relevant factors.

## 1. Whether the Court Considered Irrelevant Factors

First, the government argues the court placed great weight on the five-and-a-half-hour delay between the time the officers became aware of the Quinteros's check-in at the hotel and the time the officers commenced the knock-and-talk at 10:30 p.m. The government contends the delay was irrelevant and no evidence established the officers intentionally delayed their investigation to confront the Quinteros at night.

We conclude the court properly considered the time of the search in determining whether Michelle's consent was voluntary. First, our case law suggests

the factors enumerated under the totality of the circumstances inquiry are non-exhaustive. See, e.g., United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (noting the totality of the circumstances analysis for a custody determination is "decidedly non-exhaustive"); see also United States v. Romero, 743 F. Supp. 2d 1281, 1303 (D. N.M. 2010) ("The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given."). Accordingly, it was not improper for the court to consider the fact the Quinteros were rousted out of bed at 10:30 p.m. by a number of officers and security personnel, as well as the officers' unexplained delay in executing the knock-and-talk.

Moreover, regardless of whether the officers intentionally delayed their investigation to effectuate a nighttime search, our precedent clearly recognizes the time of the day during which a search takes place is relevant in the analysis. See United States v. Barnum, 564 F.3d 964, 971 (8th Cir. 2009) ("Barnum was situated behind his rental vehicle on the side of the road in broad daylight when he gave the consent, and he was not in police custody."); United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008) (considering the fact the knock-and-talk at a motel room occurred during mid-day in analyzing whether the officers' conduct was coercive); United States v. Smith, 260 F.3d 922, 925 (8th Cir. 2001) (noting the search took place during daylight in a public place, which weighed in favor of the government in the voluntariness determination). The government bears the burden of demonstrating voluntariness, by which it "must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making." United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005) (internal quotation marks and citation omitted). As part of determining whether Michelle's consent was free and unconstrained, the court was tasked with examining the environment in which the consent took place. See United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) ("In viewing the totality of the circumstances, it is

appropriate to consider . . . the conditions under which the consent to search was given (such as . . . the duration, location, and time of the encounter).").  Thus, the fact the officers inexplicably delayed their investigation, culminating in a nighttime knock-and-talk designed to consummate in a full-scale search, was relevant to the court's determination.  In particular, the officers' rousting of the Quinteros from bed at night helped create a more coercive atmosphere, and thus the court did not err in considering this fact in its analysis.

## 2.  Whether the Court Failed to Consider Proper Factors

Second, the government argues the court misapplied the law by not addressing four factors which weighed in favor of voluntariness: (1) the short length of time of the encounter; (2) the fact Michelle was not in custody when she gave consent; (3) the fact her initial consent was given in a public place; and (4) the fact she was not passively silent during the search, but objected to it.

We disagree.  As an initial matter, the government's argument suggests a mechanical analysis of the factors is required, which has been expressly rejected by this court on numerous occasions.  See United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008) ("Though these factors are valuable and guide our analysis, we do not employ them mechanically.") (internal quotation marks and citation omitted); Willie, 462 F.3d at 896 ("No one factor is dispositive; they are merely tools for analyzing the totality of all the circumstances.") (internal quotation marks and citation omitted).

Further, we reject the government's implication as to the court not being cognizant of these factors in its analysis.  For instance, the court's order confirms it was intimately aware of the timing of the encounter, as it discussed at length the timing between the hotel's notification to Weber at 4:23 p.m. of the Quinteros's return to the hotel and the officers' arrival on the scene at 9:45 p.m.  The court detailed the K-9 search at 10:26 p.m outside the first room associated with the

-11-

Quinteros, the 10:33 p.m. search outside the second room, and the specific timing associated with the encounter. See, e.g., Suppression Order at 4 ("After four to five minutes of directing Michelle to get dressed, Michelle came to the door"). Indeed, at the hearing, the court viewed the hotel surveillance footage, and it listened to the recording of the encounter in its entirety. After a careful review of the record, we reject any notion the court was not aware of the factors it was required to consider.

Next, the government argues the court misapplied the law by giving insufficient weight to the defendant-specific factors, such as Michelle's age, intelligence, and education; whether she was intoxicated at the time; whether she was read her Miranda rights; and whether she had a criminal history and was aware of her legal protections. In its order, the court stated:

> Michelle was not called to testify. Little information is known about her age or mental ability. Agent Weber testified, however, that the Quinteros were known to law enforcement before the circumstances giving rise to this case. The Court is not concerned that Michelle lacked the ability to consent or did not understand the process. Instead, the Court is concerned about the timing of the investigation and the coercive manner in which the officers went about obtaining consent.

Id. at 10. The government contends these factors weighed in its favor, and the court's "concession" to them cannot be overstated in the analysis.

We are not persuaded by the government's argument. As the government recognizes, the court expressly acknowledged the defendant-specific factors in its analysis. Rather, the government essentially disagrees with the outcome of the court's weighing of the factors. The court explicitly stated it was concerned the other relevant factors showed the officers obtained Michelle's consent in a coercive manner, and these coercive factors outweighed the other factors under the circumstances. See United States v. Cisneros-Gutierrez, 598 F.3d 997, 1003 (8th Cir.

-12-

2010) ("In determining voluntariness, the personal characteristics of the individual who supposedly consented *and* the environment in which the consent allegedly occurred are relevant.") (emphasis added). Under the totality of the circumstances, we find no error in the court's determination.

The problem with the government's argument is exemplified by its analogy to United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005) (en banc), where this court held a defendant voluntarily consented to a search, in part, because the defendant-specific factors favored a finding of voluntariness. In Va Lerie, the defendant testified he consented to the search, the officer displayed his badge and identified himself as law enforcement, and no officer threatened or coerced the defendant. Id. at 709-10. None of these "numerous facts supporting a finding of voluntary consent," id. at 710, are present in this case; to the contrary, there were numerous facts demonstrating coercion on the part of the officers and fear on the part of Michelle. Within this context, the government's argument fails because the court concluded the coercive factors outweighed those supporting voluntariness under the totality of the circumstances, and, as stated above, we find no error in this conclusion.

### 3. Whether the Court Misconstrued Factors

Finally, the government argues the court misapplied the law by holding Michelle was coerced into consenting to the search because other reasons, such as the hidden methamphetamine, justified her fear, and the presence of six individuals – three officers, two security guards, and one hotel manager – was insufficient to create a coercive environment. The government also asserts the court misapplied the law in holding the officers made misrepresentations which led to the involuntary consent because officer deception, standing alone, does not invalidate consent. Moreover, the government argues Michelle knew her consent to search would reach locations where the narcotics could be hidden.

-13-

We disagree. The record supports the court's conclusion as to the coercive atmosphere, which, coupled with the officers' misrepresentations and Michelle's repeated expressions of fear, demonstrated her consent was involuntary. We find illustrative the Supreme Court's decision in United States v. Drayton, 536 U.S. 194, 204 (2002), where the Court concluded an encounter was not coercive because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Unlike in Drayton, there were copious facts here supporting coercion. Six individuals, including three officers and two security guards, conducted a late-night knock-and-talk after an inexplicable delay, rousting the Quinteros from sleep. Weber misrepresented his identity at the door, commanded Michelle to get dressed and come to the door multiple times, and took several minutes to repeatedly badger her for consent to search the room in the face of her hesitation, as well as her repeated statements to the effect that the officers were "scaring the shit out of [her]." Weber also falsely told Michelle he only wanted to take "a quick peek around," when he endeavored to conduct a full-scale search of the room and the Quinteros's belongings. To this end, Weber admitted his forceful tactics were the only way he could search the room because he had no probable cause or exigent circumstances. Under these circumstances, the court did not err in concluding Michelle's consent was the product of duress and coercion, rather than of her own free will. See United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006) ("Consent is voluntary if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress and coercion, express or implied.") (internal quotation marks and citation omitted).

We are unpersuaded by the government's attempts to diminish the effect of the officers' coercion, such as its assertion as to Michelle's fear being the product of her own illegal activity, rather than the officers' threatening conduct. This argument runs counter to our precedent, which holds "[t]he defendant's actual subjective state of mind at the time that he allegedly gave his consent is not determinative; our focus,

-14-

rather, is on how a reasonable person could have perceived his state of mind at that time." United States v. Starr, 533 F.3d 985, 995 (8th Cir. 2008) (internal quotation marks and citation omitted); see also Florida v. Bostick, 501 U.S. 429, 438 (1991) ("[T]he 'reasonable person' test presupposes an *innocent* person."). Accordingly, in determining whether a reasonable innocent person's consent was involuntary, "[t]he internal psychological pressure associated with a suspect's knowledge of his or her own guilt, or fears that evidence of such guilt has been discovered by police, have no bearing on this question." United States v. Torres-Castro, 374 F. Supp. 2d 994, 1028 (D. N.M. 2005). We therefore reject the government's efforts to supplant Michelle's fear from the officers' conduct with the alleged fear of her own criminal activity.

In sum, "[t]he ultimate question is whether the individual's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary." United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotation marks and citation omitted). The district court held, after considering all the evidence, the government failed to show Michelle voluntarily consented to a search. We find no clear error in the court's conclusion as to the involuntariness of Michelle's consent to search.

III

We affirm the district court's grant of the Quinteros's motion to suppress.

_____