# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2034

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Dennis Daniel Dunning, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 18, 2011
Filed: January 27, 2012

_____

Before SMITH, COLLOTON, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Dennis Dunning conditionally pleaded guilty to being a convicted felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). At sentencing, over Dunning's objection, the district court[1] found that Dunning qualified as an armed career criminal under 18 U.S.C. § 924(e). The district court sentenced Dunning to 188 months' imprisonment. On appeal, Dunning argues that the district court erred in denying his motion to suppress evidence found during the search of his person, bag, and truck, as well as incriminating statements obtained from him,

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

resulting from a police officer's purportedly unlawful detainment of Dunning. Additionally, he argues that the district court erred in sentencing him as an armed career criminal under § 924(e). We affirm.

## I. *Background*
### A. *Factual Background*

Deputy Sheriff Travis McConnell of the Taney County, Missouri Sheriff's Department (TCSD) was dispatched to assist TCSD Detective Roger Ellis in a credit card fraud investigation at the Big Cedar Lodge ("Lodge"), a resort near Branson, Missouri. Upon his arrival, Deputy McConnell learned that a person calling himself "Joshua Fenner" was renting cabin 618 at the Lodge and that he had registered using the credit card of his father, Edward Fenner. The Lodge's loss-prevention employees contacted Edward Fenner, who told them that he did not have a son and had not authorized anyone to use his credit card. In addition to "Joshua Fenner," a registration card identified a second occupant of the room as "Dennis." A red Ford truck was also listed on the registration card. Lodge employees informed law enforcement that their cleaning department discovered partial marijuana cigarettes in an ashtray while cleaning the cabin and also smelled the odor of marijuana.

Lodge employees accompanied law enforcement to cabin 618. Officers located one individual, later identified as Adam Henderson. Inside the cabin, they discovered a check-writing program and credit card numbers stolen from a Branson business— items sometimes used to commit credit card fraud. Detective Ellis arrested Henderson, took him to the Taney County jail, and went to obtain a search warrant for cabin 618. Lodge employees changed the electronic key card lock for the cabin to secure it.

At Detective Ellis's request, Deputy McConnell stayed at the Lodge to secure the location. Detective Ellis told Deputy McConnell to detain anyone who came to the cabin because the police were expecting more individuals to come back to the

cabin that evening. The Lodge permitted Deputy McConnell to use cabin 620 for surveillance of cabin 618. Lodge employees informed law enforcement that no other cabins were rented in the area, so anyone coming up the road would be going to cabin 618. A Lodge security officer remained with Deputy McConnell at cabin 620. From his vantage point, Deputy McConnell could see the front door and front side of cabin 618, as well as the roadway leading up to the cabins. While waiting in cabin 620, Deputy McConnell heard a loud vehicle coming up the road. Deputy McConnell saw a red Ford truck approaching. A single male exited the vehicle. The man, carrying a bag over his shoulder, attempted to enter cabin 618. When his key card did not work, he began knocking on the door and calling for "Adam." Deputy McConnell, who was in uniform, made contact with the man, and they talked briefly. The man appeared confused at first. Deputy McConnell did not ask the man why he was at cabin 618, nor did he learn if the man was the other occupant of cabin 618. According to Deputy McConnell, he had not seen the man involved in any criminal activity at that point. But he did know that a red Ford truck was registered to cabin 618.

Deputy McConnell asked the man to accompany him to cabin 620, and the man voluntarily went to cabin 620. Deputy McConnell admitted, however, that the man was not free to leave and that he would have arrested him if he had tried to flee. Once inside cabin 620, Deputy McConnell asked the man his name, and the man responded "Dennis." "Dennis" was later identified as "Dennis Dunning." Deputy McConnell noticed that Dunning was guarding the bag that he was carrying, attempting to move the bag out of Deputy McConnell's sight. Deputy McConnell could smell the odor of marijuana on Dunning.

Deputy McConnell asked Dunning whether he had any guns, knives, bombs, or explosives. He also asked Dunning to place his bag on the couch. Less than five minutes after Deputy McConnell first encountered Dunning, Deputy McConnell asked Dunning for permission to search Dunning's person. According to Deputy McConnell, Dunning responded "yes." Deputy McConnell only asked Dunning one

time for permission to search and made no threats or promises, nor did he have his gun drawn. Dunning did not hesitate in granting consent. Deputy McConnell asked Dunning for consent to search his person because Dunning was wearing a large coat, and Deputy McConnell could not be sure that Dunning was unarmed with a *Terry*[2] pat-down. Dunning made no complaints during the search and never asked Deputy McConnell to stop. During the search, Deputy McConnell could not feel anything through Dunning's thick coat, so Deputy McConnell reached inside Dunning's pockets. Deputy McConnell found a marijuana cigarette in Dunning's right coat pocket. McConnell continued the head-to-toe search; when Deputy McConnell got to Dunning's cargo pants, Deputy McConnell felt a big, bulky object that he could not clearly identify. Deputy McConnell asked Dunning what the object was, but Dunning said that he did not know. Deputy McConnell removed the object from Dunning's right cargo pants pocket—a black box. The black box contained a glass pipe, the type typically used to smoke illegal drugs, and several packets of a white, powdery substance.

After searching Dunning and discovering the contraband, Deputy McConnell handcuffed Dunning and placed him on the couch with his bag. As Dunning sat down, Deputy McConnell moved the bag to the other end of the couch to prevent Dunning from reaching it. When Deputy McConnell moved the bag, he turned it and noticed that it had a large open pocket on the back. He looked inside, and, in plain view, he could see a large bag of a green leafy substance, which he knew to be marijuana. Deputy McConnell then searched the rest of the bag and found a pistol; some ammunition for a shotgun; a large package of a white, powdery substance; a large amount of cash; and digital scales.

---

[2]*Terry v. Ohio*, 392 U.S. 1 (1968).

Deputy McConnell read Dunning his *Miranda*[3] rights and asked him about the contents of the bag. Dunning said that someone had left the bag in his truck the night before and that he did not know to whom the bag belonged. Dunning said that he had looked inside the bag, saw what was in it, and was bringing it back to "Adam." Dunning also stated that he had previously been in cabin 618 and that some of his clothes were in the bedroom. At that point, Deputy McConnell called for other officers to come to the cabin and continued to wait for Detective Ellis to return with the search warrant. Two officers arrived and interviewed Dunning. Information obtained from that interview, as well as the information that Deputy McConnell obtained from Dunning, was used in an application for a search warrant for Dunning's truck.

## B. *Procedural Background*

Dunning was indicted for possession with intent to distribute a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) ("Count 1"); possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) ("Count 2"); and being a convicted felon in possession of firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count 3").

Dunning filed a motion to suppress evidence seized from his person and bag, arguing that his detention and arrest were unlawful. Following a hearing on the motion, the magistrate judge recommended that the district court deny Dunning's motion to suppress. First, the magistrate judge found that Deputy McConnell had a "reasonable suspicion of criminal activity to support" detaining Dunning. *United States v. Dunning*, No. 09-03039-01-CR-S-DGK, 2009 WL 4729005, at *4 (W.D. Mo. Dec. 4, 2009) (slip copy). Second, the magistrate judge found that Deputy McConnell lawfully searched Dunning's person, noting that no evidence disputed

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

-5-

Deputy McConnell's testimony that Dunning consented to the search of his person. *Id*. at *5. The magistrate judge also concluded that such consent was "voluntarily given." *Id*. Third, the magistrate judge determined that Deputy McConnell lawfully searched Dunning's bag, as the marijuana in the bag was in Deputy McConnell's plain view. *Id*. at *6. Finally, the magistrate judge found that "the search of [Dunning's] truck was conducted pursuant to a search warrant, and because the evidence in support of that warrant was legally obtained, there is no argument for suppression under the fruits of the poisonous tree doctrine." *Id*. The district court[4] adopted the magistrate judge's report and recommendation denying Dunning's motion to suppress. *Id*. at *1.

Thereafter, Dunning conditionally pleaded guilty pursuant to a plea agreement to Count 3. Dunning reserved his "right to file a direct appeal from his conviction to obtain appellate review of the denial of his pretrial motion to suppress evidence."

The probation office prepared a presentence investigation report (PSR), which classified Dunning as an armed career criminal under 18 U.S.C. § 924(e). Paragraph 51 of the PSR stated that Dunning had entered an *Alford*[5] plea to the Class D felony of resisting arrest on September 4, 2004, "by fleeing from the officer in such a manner that created a substantial risk of serious physical injury or death to any person, in violation of [Missouri Revised Statutes] § 575.150." Paragraph 52 of the PSR stated that Dunning had pleaded guilty to the Class D felony of resisting arrest on December 22, 2004, "by fleeing from the officer in such a manner that created a substantial risk of serious physical injury or death to any person," in violation of § 575.150.

---

[4]The Honorable Greg Kays, United States District Judge for the Western District of Missouri. Following Judge Kays's adoption of the report and recommendation denying Dunning's motion to suppress, the case was reassigned to Judge Dorr.

[5]*North Carolina v. Alford*, 400 U.S. 25 (1970).

Paragraph 54 of the PSR stated that Dunning entered an *Alford* plea to the Class C felony of possession of a controlled substance, in violation of Missouri Revised Statutes § 195.202; the Class B felony of possession of a controlled substance with intent to distribute, in violation of Missouri Revised Statutes § 195.22; and the Class D felony of resisting arrest on April 27, 2005, "by fleeing from the officer in such a manner that created a substantial risk of serious physical injury or death to any person[,] in violation of . . . § 575.150."

At sentencing, Dunning objected to the PSR's classification of him as an armed career criminal under 18 U.S.C. § 924(e). Dunning, however, acknowledged that he was arguing contrary to Eighth Circuit precedent because this court previously held that a felony conviction under § 575.150 is a per se crime of violence. The district court denied Dunning's objection, finding that it was bound by Eighth Circuit precedent. After applying a three-level reduction for acceptance of responsibility, the district court calculated an offense level of 31 and a criminal history category of VI, resulting in an advisory Guidelines range of 188 to 235 months' imprisonment. The district court sentenced Dunning to 188 months' imprisonment.

## II. *Discussion*

On appeal, Dunning argues that the district court erred in (1) denying his motion to suppress evidence found during the search of his person, bag, and truck, as well as incriminating statements, resulting from Deputy McConnell's purported unlawful detainment of Dunning; and (2) sentencing him as an armed career criminal under 18 U.S.C. § 924(e).

### A. *Motion to Suppress*

Dunning argues that incriminating items found on his person, inside his bag, and inside his truck, as well as his incriminating statements, were obtained as a direct result of an unlawful stop and therefore should be suppressed.

In response, the government argues that Dunning's detention was valid because Deputy McConnell had a reasonable, articulable suspicion that Dunning was engaged in criminal activity. The government also contends that Dunning consented to the search of his person. Finally, the government asserts that Deputy McConnell validly seized the marijuana from Dunning's bag because Deputy McConnell observed the marijuana in plain view and lawfully searched the bag incident to Dunning's arrest.

"In considering the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. Kelley*, 652 F.3d 915, 917 (8th Cir. 2011).

### 1. *Detention*

According to Dunning, Deputy McConnell had no objectively reasonable, articulable suspicion of criminal activity. He asserts that his detention's duration exceeded the permissible parameters of a *Terry* stop. He contends that Deputy McConnell saw no criminal activity or sufficient suspicious behavior to warrant police intervention. He notes that Detective Ellis instructed Deputy McConnell to detain *any* person who arrived on the scene regardless of their identity or conduct. And, he points out that Deputy McConnell removed him to a different cabin where he was not free to leave. According to Dunning, he never consented to the encounter with Deputy McConnell or agreed to go to cabin 620 with him.

"We look at the totality of the circumstances to determine whether an investigatory stop . . . was justified." *United States v. Gilliam*, 520 F.3d 844, 846 (8th Cir. 2008). "In *Terry v. Ohio*, the Supreme Court held that an officer may conduct a brief, investigatory stop of an individual if the officer has a reasonable, articulable suspicion that the individual is involved in criminal activity." *Id*. (citing *Terry*, 392 U.S. at 30). "Reasonable suspicion does not exist solely on the basis of an officer's hunch." *Id*. Instead, "the officer must be able to articulate some minimal, objective justification for a *Terry* stop." *Id*.

Here, several facts provided Deputy McConnell with an objective justification for stopping Dunning. First, Deputy McConnell knew that two men were staying in the cabin in which he and other officers had observed criminal activity. Second, one of those guests, whose real name was "Adam Henderson" was arrested for using a false name to rent the cabin. Third, the guests had registered a red Ford pickup truck as the vehicle that they drove. Fourth, the code to cabin 618 had been changed, so no one would be able to use an old card to enter the cabin. Fifth, the only cabin that was rented on the road was cabin 618. Sixth, Dunning approached cabin 618 driving a red Ford pickup truck—the type of vehicle registered to the guests of cabin 618. Seventh, Dunning attempted to use a key card to open the door to cabin 618—the same cabin in which officers had just discovered illegal activity. Eighth, Dunning began knocking on the door and yelling for "Adam"—the same first name of one of the guests just arrested—when the card did not work.

Dunning relies on Deputy McConnell's testimony that Detective Ellis advised him to detain *anyone* who approached cabin 618. But the test that this court must apply is an objective one, *see id*., and the facts set forth *supra* establish that an officer would have a reasonable, articulable suspicion that Dunning was the individual listed as the other registered guest at the cabin where officers had just discovered illegal activity. And, in fact, Officer McConnell's suspicions were validated when Dunning confirmed that his first name was "Dennis," the first name of the individual listed as the second guest on the registration card. Furthermore, once inside cabin 620, Deputy McConnell noticed that Dunning smelled of marijuana and was attempting to hide the bag that he was carrying from Deputy McConnell.

Accordingly, we hold that, under the totality of the circumstances, Deputy McConnell's investigatory stop of Dunning was justified.

## 2. Search of Dunning's Person

Dunning argues that he did not voluntarily consent to the search of his person, as he was "forcefully removed from a location in which he legally had a right to be and taken to a different cabin." He asserts that he was not free to leave or ever told that the encounter was "voluntary" or that he was not under arrest. According to Dunning, the facts show that he was under arrest without probable cause or reasonable suspicion; as a result, all incriminating items found on his person were obtained as a direct result of the unlawful stop and should be suppressed.

The government conceded before the district court that Deputy McConnell's search of Dunning's person "exceeded the typical scope of a *Terry* pat down." *Dunning*, 2009 WL 4729005, at *5. But the government argues that the search of Dunning's person was based on his voluntary consent.

"While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain a resident's voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). "The government bears the burden of proving voluntary consent." *Id*. We review "the totality of the circumstances" when "determining whether consent is voluntary" and consider the following factors:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and

-10-

(6) whether the individual stood by silently or objected to the search.

*Id*. (quotation and citation omitted).

Applying the aforementioned factors to the present case, we hold that Dunning voluntarily consented to the search of his person. Although Dunning was not read his *Miranda* rights prior to the search, he was experienced in the legal system and likely aware of his rights. As to the environment in which Deputy McConnell obtained Dunning's purported consent, Dunning was not free to leave and consented to the search in a private cabin instead of a public location. Nevertheless, the remaining factors support the district court's determination that, under the totality of the circumstances, Dunning voluntarily consented to the search of his person. First, Dunning is an adult and apparently of normal mental ability. Second, although he smelled of marijuana, nothing in the record supports a finding that Dunning was under the influence of drugs. Third, Dunning has not challenged as clearly erroneous the magistrate judge's finding that "[t]he time that Officer McConnell detained him until he asked for consent to search was less than five minutes." *Dunning*, 2009 WL 4729005, at *6. Therefore, the detention was not "unduly lengthy." *Id*. Fourth, Dunning has not argued, nor does the record reflect, that Deputy McConnell used any threats, physical intimidation, or punishment to extract Dunning's consent. Fifth, Deputy McConnell made no promises or misrepresentations to Dunning prior to the search. Finally, Dunning voiced no objections to the search.

We conclude that Deputy McConnell conducted a consensual search of Dunning's person.

### 3. *Fruit of the Poisonous Tree*

Dunning contends that the "incriminating items found on [his] person, inside the backpack [that] he was carrying[6] and inside the truck [that] he was driving, as well as any other incriminating statements" resulting from the purported illegal stop should be suppressed as "fruit of the poisonous tree."

Because we have already rejected Dunning's arguments that Deputy McConnell illegally detained him and searched his person, "'his 'fruit of the poisonous tree' argument fails.'" *United States v. McIntyre*, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting *United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006)).

### B. *Armed Career Criminal*

Dunning argues that "[r]esisting arrest and [the] distribution of marijuana are not crimes of violence" under *Begay v. United States*, 553 U.S. 137 (2008); therefore, the district court erred in sentencing him as an armed career criminal under 18 U.S.C. § 924(e).

"We review de novo the district court's determination that [Dunning's] conviction[s] for resisting arrest [were] . . . violent felon[ies]." *United States v. Lamar*, 419 F. App'x 704, 705 (8th Cir. 2011) (unpublished per curiam).

"Section 924(e)(2)(B)(ii) lists specific crimes that constitute violent felonies. It also includes a residual clause that encompasses crimes 'otherwise involv[ing]

---

[6]On appeal, Dunning has not challenged the district court's conclusions that (1) Deputy McConnell "legally seized" the marijuana from Dunning's bag "under the plain view doctrine" and (2) "[b]ased on defendant's arrest by that time, the evidence located in the bag under further scrutiny was legally obtained, as a legal search incident to arrest." *Dunning*, 2009 WL 4729005, at *6.

conduct that presents a serious potential risk of physical injury to another.'" *Id.* (alteration in original) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). "A felon in possession of a firearm who has committed three previous violent felonies faces an increased mandatory minimum prison term of 180 months." *Id.* (citing 18 U.S.C. § 924(e)(1)).

Here, Dunning challenges "the district court's conclusion that his [three prior] conviction[s] for resisting arrest by 'fleeing in such a manner that [he] create[d] a substantial risk of serious physical injury or death to any person,' Mo. Rev. Stat. § 575.150(5), fell within the residual clause." *Id.* (third and fourth alterations in original). Relying on *Begay*, he asserts "that the district court erred by concluding that his conviction[s] under Mo. Rev. Stat. § 575.150(5) [were] . . . violent felon[ies]." *Id.*

Dunning's argument is foreclosed by *Sykes v. United States*, 131 S. Ct. 2267 (2011), where the Supreme Court held that a driver of a vehicle who knowingly or intentionally flees from a law enforcement officer commits a violent felony even though in the statute at issue, as here, there was no mens rea requirement related to the risk of injury. *Id.* at 2274–76. Indeed, the Indiana statute at issue in *Sykes* did not even require proof that the defendant's flight created a substantial risk of bodily injury to another person, yet it still qualified as a violent felony. *Id.* at 2276. The Missouri statute under which Dunning was convicted required proof that Dunning's flight created a substantial risk of serious physical injury or death to any person, so it more easily qualifies as a violent felony than did the statute in *Sykes*.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____